IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
ROCK HILL DIVISION

| | |
|---|---|
| Rolf Kamp,<br><br>    Plaintiff,<br><br>vs.<br><br>Empire Fire and Marine Insurance Company,<br><br>    Defendant. | C/A No. 3:12-cv-904-JFA<br><br><br><br>**ORDER ON<br>MOTIONS FOR<br>SUMMARY JUDGMENT** |

**I. INTRODUCTION**

This matter is before the Court on the parties' cross motions for summary judgment. More particularly, on February 29, 2012, Plaintiff Rolf Kamp (Kamp) filed the instant suit in York County, South Carolina, alleging causes of action for breach of an insurance contract and bad faith denial of coverage. On March 30, 2012, Defendant Empire Fire and Marine Insurance Co. (Empire) removed the case to this Court. On November 1, 2012, Kamp filed a motion for partial summary judgment on its claim for breach of contract. *See* ECF No. 26. Then, on December 3, 2012, Empire filed a motion for summary judgment on both of Kamp's claims. *See* ECF No. 30.

The Court has reviewed the record and the memoranda of counsel and considered the arguments presented at a hearing held on January 16, 2013. For the reasons set forth below, the Court denies Kamp's motion for partial summary judgment and grant's Empire's motion for summary judgment.

1

**II.     FACTUAL OVERVIEW**

Empire issued a policy of automobile liability coverage to Harley-Davidson Financial Services, Inc. for minimum financial responsibility coverage under policy SF0103840 (the Minimum Financial Responsibility Policy).  The policy extended coverage to R&K Harley Davidson, Inc. d/b/a Harley Davidson of Charlotte (R&K), a North Carolina corporation, by endorsement.  The Minimum Financial Responsibility Policy provided liability limits equal to those required by North Carolina, $30,000 per person for bodily injury, $60,000 per accident for bodily injury, and $25,000 per accident for property damage.  It also provided the same limits for uninsured motorist (UM) coverage, as required by North Carolina law.

Additionally, Empire issued a second policy to Harley-Davidson Financial Services, Inc. under policy SI/PC0103843 (the Supplemental Policy).  This policy includes three separate coverage parts: (1) Supplemental Rental Liability Insurance (SLI); (2) Personal Accident Coverage (PAC); and (3) Personal Property Coverage (PPC).  A Certificate of Insurance also added R&K to this policy as an additional policyholder.  In general, the Supplemental Policy is designed to offer a rentee of one of R&K's motorcycles the ability to enroll in one or more of the SLI, PAC, and PPC coverages.  The rentee indicates that he desires to enroll in a particular coverage by initialing on the rental agreement that he accepts the terms and agrees to pay a daily fee for each coverage selected.  If he accepts the offer to enroll in these coverages, the rentee becomes an insured by definition under the Supplemental Policy owned by and issued to Harley-Davidson Financial Services.

Interpretation of the terms regarding SLI coverage in the Supplemental Policy is the primary issue in this case.  Generally, the Supplemental Policy comprises a master policy applicable to the entire country and state-by-state endorsements.  Certificates of Insurance are

issued to various Harley-Davidson franchises around the country.  The policy provisions for the Supplemental Policy state that this policy "provides excess auto liability insurance and only applies to a 'loss' involving 'bodily injury' and 'property damage' caused by an 'accident' and resulting from the use of a covered 'rental vehicle.'"  Also, according to the main policy document, "the most [Empire] will pay for 'ultimate net loss' is the difference between the limits of liability provided by the 'underlying insurance' and the 'supplemental rental liability insurance' limit shown in the Declarations."

The policy includes Declarations which specify Empire's limits of liability for both 1) bodily injury and property damage liability; and 2) "Uninsured / Underinsured Motorist Coverage" under the SLI coverage.  For both types of insurance, the Declarations state that Empire's limit of liability is $1,000,000, and the premium is denoted as "PER CERT."  Notably, the Declarations state that "FORMS AND ENDORSEMENTS applicable to any and all Coverage's [sic] and made a part of this policy at the time of issue" are found on a form denoted "EM3022."  Form EM3022 lists, among other documents, the SLI policy provisions, a form referred to as "Policy Changes," and the endorsements for each state as forms or endorsements "which affect the applicable insurance coverage's [sic]."  The "Policy Changes" form itemizes the certificates issued to each Harley-Davidson dealer in each state, including certificate number NC009, issued to R&K.

Importantly, the SLI policy provisions specifically exclude "[l]iability arising out of or benefits payable under any uninsured [UM] or underinsured motorists law, in any state."  However, following the main policy form are endorsements directed at various states in which Harley-Davidson franchises are located.  The endorsements state that, unless an endorsement modifies the policy, the SLI policy provisions apply.  The endorsements of most states, including

3

North Carolina's, do not contain provisions adding UM coverage back to the SLI policy. However, some states' endorsements, including those of Florida, Louisiana, New Hampshire, North Dakota, Vermont, and West Virginia, add UM coverage back to the SLI policy. Some of these states' endorsements, such as North Dakota's, limit the added UM coverage to the state's financial responsibility limit (e.g., $50,000). Others of these states' endorsements, such as Vermont's, contain UM limits up to $1,000,000, equal to the limit of liability insurance in the policy. In any event, the UM coverage added in these endorsements is limited to automobiles licensed or principally garaged in those states.

As explained above, Harley-Davidson Financial Services, Inc. is the primary policyholder of the Supplemental Policy, but Empire granted coverage under the Supplemental Policy to individual Harley-Davidson franchises via Certificates of Insurance. The Certificate of Insurance issued to R&K states that it "neither affirmatively nor negatively amends, extends or alters the coverage provided by the policy named within." The Certificate then states that R&K is an additional policyholder under the Supplemental Policy "for the following coverages/limits": 1) for PAC, a $50,000 death benefit and $2,500 for medical expenses; 2) for PPC, $750 per person; and 3) for SLI, an "Excess Auto Liability" limit of $1,000,000. However, the Certificate issued to R&K does not mention UM coverage for SLI or a premium therefor. Rather, the Certificate states that SLI is "[e]xcess liability insurance and only applies to loss involving bodily injury and/or property damage caused by an accident and resulting from the use of a Rental Vehicle." Further, similar to the main policy form, the Certificate states that the "maximum Limit of Liability for the Supplemental Rental Liability Coverage is the difference between the Limit of Liability indicated on the Declarations and the Underlying Insurance specified within your signed rental agreement."

On April 8, 2011, Kamp, a citizen of Germany, rented a motorcycle from R&K. Because he was a permissive user of R&K's motorcycle, he was an insured under R&K's Minimum Financial Responsibility Policy. Kamp also requested "full coverage" from R&K, and accordingly he purchased all three of the coverages (i.e., PAC, PPC, and SLI) provided under R&K's Certificate to the Supplemental Policy. However, he did not specifically request UM coverage. R&K did not provide Kamp with copies of the Minimum Financial Responsibility Policy and the Supplemental Policy, but he received at least one brochure summarizing the coverages he purchased under the Supplemental Policy. Kamp admitted he did not read the brochure, which did not mention UM coverage.

Kamp was involved in a motor vehicle accident in York County, South Carolina, later that day. The at-fault motorist was operating an uninsured vehicle, and no insurance coverage was available to her. Kamp filed suit against the motorist in York County, and Kamp ultimately obtained a default judgment against the motorist in the amount of $2,500,000.

After Kamp made a claim for UM benefits, Empire eventually paid Kamp $30,000 for UM benefits under the Minimum Financial Responsibility Policy and $2,500 for medical expenses under the PAC coverage in the Supplemental Policy. However, Kamp also demanded UM benefits under the SLI coverage in the Supplemental Policy. Kamp initially argued that, under North Carolina law, the SLI coverage automatically included UM coverage in an amount equal to the bodily injury liability limit—$1,000,000. Empire denied this portion of Kamp's claim, taking the positions that the SLI coverage in the Supplemental policy excluded UM coverage and that state law did not require UM coverage to be offered in connection with an "excess" policy of automobile insurance. Empire did not provide Kamp a copy of the Supplemental Policy during these discussions. The instant suit followed.

**III.    LEGAL STANDARD AND CHOICE OF LAW**

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted when a moving party has shown that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The Court must determine whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).  When evaluating a motion under Rule 56, the Court must construe all "facts and inferences to be drawn from the facts . . . in the light most favorable to the non-moving party," *Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir. 1990), and summary judgment should be granted in those cases where it is perfectly clear that there remains no genuine dispute as to material fact and inquiry into the facts is unnecessary to clarify the application of the law.  *McKinney v. Bd. of Trustees of Md. Cmty. College*, 955 F.2d 924, 928 (4th Cir. 1992).  In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249.

A federal court sitting in diversity must apply the choice of law rules of the forum state. *CACI Int'l, Inc. v. St. Paul Fire & Marine Ins. Co.*, 566 F.3d 150 (4th Cir. 2009).  Generally, in South Carolina contracts are subject to interpretation based on the law of the state where the contract was made.  *See, e.g.*, *Long v. Adams*, 312 S.E.2d 262, 264–65 (S.C. Ct. App. 1984) (interpreting insurance policy under North Carolina law where policy was written in North Carolina and delivered to a North Carolina corporation having its principal place of business in that state).  The parties agree that North Carolina law applies to this case because the Supplemental Policy was delivered to a North Carolina insured, R&K.  Therefore, although the

accident at issue in this case occurred in South Carolina, the below discussion addresses only North Carolina law.

**IV.    DISCUSSION**

As noted above, both Kamp and Empire have moved for summary judgment on Kamp's breach of contract claim, and Empire has also moved for summary judgment Kamp's bad faith claim.  Each of these two claims is discussed in detail separately below.

### A.  *Kamp's Claim for Breach of Insurance Contract*

In his motion for partial summary judgment and in response to Empire's motion for summary judgment, Kamp argues that R&K's contract of insurance with Empire (under which he is an insured by definition) provides or should be reformed to provide UM coverage in the amount of $1,000,000.  According to Kamp, then, Empire breached this contract when it failed to pay the difference between this amount and the $30,000 in UM coverage in the Minimum Financial Responsibility Policy.  Kamp makes three primary arguments in support of this position.

First, he argues that the Supplemental Policy unambiguously provides $1,000,000 in UM coverage.  Kamp notes that the Declarations of the Supplemental Policy state that Empire's limit of liability for UM benefits is $1,000,000.  Although he acknowledges that the Certificate issued to R&K only provides for $1,000,000 in "Excess Auto Liability" coverage and does not mention UM coverage, Kamp points out that the Certificate does not exclude the coverage provided in the Declarations, either.

Next, Kamp makes the related argument that, even if the Supplemental Policy does not clearly include UM coverage, it is ambiguous on this point.  Thus, Kamp requests the Court construe the ambiguity against the drafter (Empire) and in favor of coverage in accordance with

well-established insurance contract interpretation case law. Here, Kamp highlights what he perceives as a conflict between the Declarations and the Certificate issued to R&K, the latter of which he states "take away" coverage granted in the policy's Declarations. Finally, Kamp argues that the North Carolina endorsement does not clarify the issue because it neither mentions nor excludes UM coverage.

Empire argues in response that the Supplemental Policy is instead unambiguous in its exclusion of coverage. Empire first explains the structure and organization of the policy, noting that it comprises several parts which must be read as a whole. These include: a master policy held by Harley-Davidson Financial Services, Inc.; endorsements for each state; a declarations page, which essentially summarizes the policy; and a plurality of certificates, by which specific franchises also become policyholders. According to Empire, it structured the policy this way so that it could have a single policy that is generally applicable to the entire country but which could also be tailored to the different laws of each state. For example, Empire points out that whereas some states require UM coverage to be offered with an excess policy, others only require UM coverage to be offered with the underlying, minimum financial responsibility policy.

With this structure in mind, Empire emphasizes that the main policy expressly excludes UM coverage and was clearly intended to grant excess liability coverage without granting UM coverage, except where specific state laws so require.[1] Empire then points to the endorsements appended to the main policy, some of which add UM coverage back to the Supplemental Policy (in varying amounts) and some of which do not. Empire refers in particular to North Carolina's endorsement, which as noted above does not add UM coverage back to the Supplemental Policy.

---

[1] According to Empire, the six states for which it added a UM endorsement each have statutes requiring UM coverage to be offered in connection with an excess liability policy. *See* FLA. STAT. ANN. § 627.727(2); LA. REV. STAT. ANN. § 22:1295(1)(b); N.H. REV. STAT. ANN. 264:15; N.D. CENT. CODE § 26.1-40-15.2; VT. STAT. ANN. tit. 23, § 941; W. VA. CODE ANN. § 33-6-31f.

Empire acknowledges that the Declarations state a $1,000,000 liability limit for both bodily injury liability and UM coverage, but it explains that this reflects the state endorsements which contain UM coverage up to $1,000,000. Finally, Empire states that the Certificate issued to R&K is consistent with the SLI policy provisions and the North Carolina endorsement because it lists only coverage for $1,000,000 in "Excess Auto" liability and states that it only applies to loss involving bodily injury and/or property damage.

The Court finds that the Supplemental Policy unambiguously excludes UM coverage. First, the SLI policy provisions clearly state that "[t]his policy provides excess auto liability insurance and only applies to a 'loss' involving 'bodily injury' and 'property damage' caused by an 'accident' and resulting from the use of a covered 'rental vehicle.'" Under the section entitled "Exclusions," the policy provisions state that "this insurance does not apply to the following: . . . [l]iability arising out of or benefits payable under any uninsured or underinsured motorists law, in any state." Six of the state endorsements alter this general rule, but they appear to do so in accordance with specific state laws. Although North Carolina's endorsement does not specifically mention UM coverage, it does state that unless it modifies the SLI policy provisions, the SLI policy provisions continue to apply. Because North Carolina's endorsement does not grant UM coverage back, the SLI policy provisions on UM coverage (i.e., that such coverage is excluded) continue to apply to North Carolina policyholders.

Moreover, the Declarations are consistent with the other portions of the Supplemental Policy. In particular, the Declarations Page clearly states that other documents are applicable to (and thus presumably may limit) the coverage amounts listed thereon. These documents include, among others, the SLI policy provisions, the state-by-state endorsements, and the form which lists the Certificates of Insurance granted to each Harley-Davidson dealership.

9

The Certificate is not inconsistent with the Declarations, which state that premiums for UM coverage are provided "PER CERT." As counsel for Empire pointed out during the hearing, the Certificate issued to R&K does not include a premium for UM coverage. That the Certificate does not mention UM coverage makes it consistent with the terms of the Supplemental Policy applicable to North Carolina. The Court also notes that the Certificate, in block letters, states that it in no way modifies the coverage granted in the Supplemental Policy. Contrary to Kamp's argument, then, the Certificate does not "take away" coverage listed on the Declarations Page, it merely states the provisions of the Supplemental Policy which are applicable to a North Carolina policyholder.

Furthermore, it is not inconsistent with the above understanding that the SLI policy provisions and the Certificate state that the "most" Empire will pay (or the "maximum liability" Empire will have) for SLI coverage is the difference between the amount indicated in the Declarations and the amount of the underlying insurance. That is a true statement—the most Empire will pay for either bodily injury or UM coverage is $1,000,000, but whether it has to pay that amount depends on a number of factors, including whether and to what extent a particular franchise's Certificate has such coverage and on the insured's damages.

Any perceived ambiguity in the contract is resolved by considering Kamp's argument as applied to states like North Dakota, where the policy purports to extend UM coverage by endorsement, but only to the extent of that state's minimum financial responsibility limits (in that case, $25,000 per person and $50,000 per accident). Under Kamp's reading of the agreement, in such states, it could be argued based on the Declarations that the Supplemental Policy in fact extends UM coverage to $1,000,000. This would clearly be contrary to the express terms of the

policy. Under the construction Empire advances, however, there is no inconsistency in this or any other state-specific situation.

Kamp's third argument is that, assuming the Supplemental Policy is unambiguous in its exclusion of UM coverage, the Supplemental Policy is a "motor vehicle liability policy" under North Carolina's Motor Vehicle Safety and Financial Responsibility Act (Financial Responsibility Act) and, as such, it must be reformed to include UM coverage up to the limit of liability insurance in the policy, $1,000,000. In relevant part, the Financial Responsibility Act provides:

> (a)     A "motor vehicle liability policy" as said term is used in this Article shall mean an owner's or an operator's policy of liability insurance, *certified as provided in G.S. 20-279.19 or 20-279.20 as proof of financial responsibility* . . . .
>
> (b)     Such owner's policy of liability insurance:
>
> . . . .
>
> (3)     No policy of bodily injury liability insurance, covering liability arising out of the ownership, maintenance, or use of any motor vehicle, shall be delivered or issued for delivery in this State . . . unless coverage is provided therein or supplemental thereto . . . for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles and hit-and-run motor vehicles because of bodily injury, sickness or disease, including death, resulting therefrom. The limits of such uninsured motorist bodily injury coverage shall be equal to the highest limits of bodily injury liability coverage for any one vehicle insured under the policy.

N.C. GEN. STAT. § 20-279.21(a), (b)(3) (emphasis added).[2] Empire responds that the Supplemental Policy is an excess liability policy, and North Carolina courts have held that an excess policy is not a "motor vehicle liability policy" under the Financial Responsibility Act.

---

[2] Subsection (b)(4) of this statute, which is in some respects similar to subsection (b)(3), deals with underinsured motorist (UIM) coverage.

11

Therefore, it argues, North Carolina does not require that UM coverage be offered or made a part of an excess liability policy of insurance.

The North Carolina Supreme Court interpreted this statute in *Progressive American Ins. Co. v. Vasquez*, 515 S.E.2d 8 (N.C. 1999), where the issue was "whether N.C.G.S. § 20-279.21 of the Financial Responsibility Act requires a commercial excess liability policy to offer separate uninsured and underinsured motorist . . . coverage in addition to what is offered by the underlying policy." *Id.* at 9. In *Vasquez*, Aetna had issued to T.A. Loving Company a Business Auto Coverage Policy (BAP) which provided UIM coverage limits and bodily injury liability limits of $1,000,000. Aetna had also issued to T.A. Loving Company a separate "Commercial Excess Liability Insurance Policy" which provided a $20,000,000 limit of liability for bodily injury, but which did not provide UM or UIM coverage. The excess liability policy referenced the BAP as the underlying insurance. The court of appeals held that the excess liability policy provided UIM coverage in the amount of $20,000,000 per accident, but the North Carolina Supreme Court reversed.

In particular, the *Vasquez* court first construed the statute to mean that the phrase "policy of bodily injury liability insurance" in subsection (b)(3) is "a continuation of the law" applying to "motor vehicle liability policies" in subsection (a), not a separate or more expansive category of insurance policy. *Id.* at 11–12. In other words, for the requirements of subsection (b)(3) to apply to a policy of insurance, the policy at issue must be a "motor vehicle liability policy" as defined in subsection (a). *Id.* at 12. Then, the supreme court explained that, under subsection (a), a "motor vehicle policy" of liability insurance must be "certified as provided in G.S. 20-279.19 or 20-279.20 as proof of financial responsibility." Because the excess policy did not meet that requirement, the excess policy was not required to offer the insured UM or UIM

12

coverage pursuant to subsections (b)(3) or (b)(4). *Id.* More specifically, neither the statute nor public policy required that "an excess liability policy offer separate UM/UIM coverage in addition to what is provided by the underlying policy where there are two separate policies: an underlying, primary policy required by law under the Financial Responsibility Act and an excess liability policy voluntarily purchased by the insured to provide further protection from liability for the insured." *Id.* at 13. Thus, in *Vasquez*, UIM coverage was "not written into the excess liability policy by operation of law." *Id.*

The instant case does not appear to be materially different than *Vasquez*. The Supplemental Policy clearly states that it is an excess policy of liability, the maximum limit of which "is the difference between the limits of liability provided by the 'underlying insurance' and the 'supplemental rental liability insurance' limit shown in the Declarations." In the policy, "underlying insurance" means "the policy or policies of insurance . . . maintained by the 'policyholder' or 'insured' which satisfy at least the Minimum Financial Responsibility requirements of the state where the accident occurred." Moreover, the policy states that "[i]n the event of cancellation or termination of underlying insurance . . . this policy will cease to apply at the same time without any further notice from us." In this case, the "underlying insurance" is the Minimum Financial Responsibility Policy, which the parties agree meets the requirements of the Financial Responsibility Act. Accordingly, as in *Vasquez*, there are two separate policies in this case: an underlying, primary policy required by law under the Financial Responsibility Act—the Minimum Financial Responsibility Policy—and an excess liability policy voluntarily purchased by Kamp to provide him further protection from liability—the Supplemental Policy.

Kamp attempts to distinguish *Vasquez* by arguing that "the [Supplemental] policy is, by its own terms, a motor vehicle liability policy." Pl.'s Reply Supp. Summ. J. 5, ECF No. 28. The

13

intended import of this statement is not clear. If Kamp is arguing simply that the Supplemental Policy is a policy of insurance which covers liability for accidents involving motor vehicles, then he is correct, but as is made clear above, for UM coverage to be required under a particular policy, the policy must be a "motor vehicle liability policy" *as defined in the statute*. A "motor vehicle liability policy" as defined in subsection (a) must be "certified as provided in G.S. 20-279.19 or 20-279.20 as proof of financial responsibility."[3] There is no indication in the record that the Supplemental Policy was certified (e.g., by R&K) as proof of financial responsibility, and its "own terms" certainly do not say this. Indeed, the terms of the Supplemental Policy require that another policy—the underlying insurance policy—have already met this requirement. Thus, Kamp's argument is unavailing.

Based on the above, Empire is entitled to summary judgment on Kamp's breach of contract claim. The Supplemental Policy unambiguously excludes coverage, and there is no evidence that it is a "motor vehicle liability policy" as defined by North Carolina's Financial Responsibility Act. Thus, North Carolina law does not require that the policy be reformed to include UM coverage up to the liability limit.

### B. *Kamp's Claim for Bad Faith*

As noted above, Empire has also moved for summary judgment on Kamp's claim for bad faith. In North Carolina, the tort of bad faith involves a showing of (1) a refusal to pay after recognition of a valid claim; (2) bad faith, i.e., a decision not based on honest disagreement or innocent mistake; and (3) aggravating conduct such as fraud, malice, gross negligence, insult, rudeness, oppression, or wanton and reckless disregard of the plaintiff's rights. *See, e.g.*, *Lovell*

---

[3] In order to register a vehicle in North Carolina, its owner must provide proof of financial responsibility, meaning the owner has a liability policy which meets the minimum requirements of the Financial Responsibility Act. Sections 20-279.19 and 20-279.20 describe methods by which a person required to furnish proof of financial responsibility may furnish such proof to the Commissioner of Insurance, such as by a Certificate of Insurance.

*v. Nationwide Mut. Ins. Co.*, 424 S.E.2d 181, 184 (N.C. Ct. App. 1993). Empire contends that any incorrect decision on coverage would have been an innocent mistake and that there is no evidence of aggravating or outrageous conduct. To show the second and third elements of bad faith under North Carolina law, Kamp responds that when Empire denied Kamp's repeated requests for coverage under the Supplemental Policy, Empire failed to mention the UM coverage listed in the Declarations of the policy. Kamp also notes that he had to wait until discovery in this case to obtain a copy of the Supplemental Policy.

The Court need not address these arguments, however, because Kamp must first show that Empire refused to pay after recognition of a valid claim. As explained in detail above, Kamp does not have a valid claim for UM coverage under the Supplemental Policy. Therefore, Empire is entitled to summary judgment on Kamp's bad faith claim for at least this reason.

### V. CONCLUSION

Before the Court in this case are cross motions for summary judgment on Kamp's breach of contract claim and Empire's motion for summary judgment Kamp's bad faith claim. Empire is entitled to judgment as a matter of law on both claims. Accordingly, the Court hereby grants Empire's motion for summary judgment and denies Kamp's motion for partial summary judgment. There being no other claims pending, the clerk is instructed to close this case.

IT IS SO ORDERED.

January 25, 2013  
Columbia, South Carolina

Joseph F. Anderson, Jr.  
United States District Judge